IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ALEXANDRA STARK, individually          )
and on behalf of all others similarly   )
situated,                               )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )          1:23-CV-22
                                        )
BLUE CROSS AND BLUE SHIELD              )
OF NORTH CAROLINA and                   )
CHANGE HEALTHCARE                       )
RESOURCES, LLC,                         )
                                        )
                    Defendants.         )

## MEMORANDUM OPINION, ORDER, and JUDGMENT

Catherine C. Eagles, Chief District Judge.

Last spring, the parties agreed to resolve this consumer protection class action by

settlement.  In July 2024, the Court preliminarily approved the proposed settlement

agreement, ordered settlement notices to be sent to the putative class members, and set a

date for a final settlement fairness hearing.  The plaintiffs have now moved for final

approval of the settlement terms under Federal Rule of Civil Procedure 23 and for

attorneys' fees and other disbursements.

The hearing on the motion for final approval was held on January 30, 2025.  The

Court has considered the record, including the lack of objections by any class members,

the proposed settlement agreement, the supporting documents and evidence, and the

statements of counsel at the final approval hearing and at previous hearings.  The Court

finds that the proposed settlement meets the requirements of Rule 23.  The Court will also

grant fair and reasonable attorneys' fees and approve reimbursement of reasonable expenses.

## I.     Background

On January 10, 2023, Alexandra Stark filed a class action complaint against Blue Cross and Blue Shield of North Carolina and Change Healthcare Inc.  Doc. 1 at 1, 15. She alleged that Change Healthcare made phone calls on behalf of BCBSNC that violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, both by making pre-recorded calls without consumers' consent and by not stopping such calls when consumers requested.  Doc. 1 at ¶¶ 45–51.

Specifically, this "wrong number" TCPA case arises because Change Healthcare allegedly made calls on behalf of BCBSNC to identify BCBSNC customers and increase enrollment in certain programs, but Change Healthcare made calls to wrong numbers or to consumers who had opted out of receiving these calls.  *Id.* at ¶¶ 20–23.  Ms. Stark alleged that despite being told that her number no longer belonged to a BCBSNC customer, Change Healthcare continued to make sales calls to her number.  *Id.* at ¶¶ 28–34.

After the Court denied a motion to dismiss filed by BCBSNC, Doc. 41, Ms. Stark filed an amended complaint expanding the claims against Change Healthcare to encompass unauthorized calls it made on behalf of clients other than BCBSNC.  Doc. 48 at ¶¶ 25–32.  The Court dismissed these new claims pursuant to Federal Rule of Civil Procedure 12(b)(6), thus limiting the class to recipients of calls Change Healthcare made on behalf of BCBSNC.  Doc. 57.

2

The parties engaged in extensive discovery. The plaintiff served written discovery requests on the defendants in July 2023, to which both responded, and her attorneys deposed defendants' corporate representatives. Doc. 63-2 at ¶ 12.

After an all-day mediation in January 2024 and a week of further negotiations, both facilitated by retired Magistrate Judge David Jones, the parties agreed on settlement terms in February 2024. Doc. 60 at ¶¶ 1–3. On May 31, 2024, Ms. Stark filed a motion for preliminary approval of the proposed class action settlement. Doc. 62. After reviewing the motion, the Court asked the parties for additional information and clarification about several issues in the proposed Settlement Agreement and Notice Plan, Text Order 06/24/2024, and held a preliminary approval hearing on June 26, 2024. Minute Entry 06/26/2024. On July 17, 2024, the Court granted preliminary approval of the class settlement. Doc. 66 at ¶ 30.

Ms. Stark has since filed a motion for attorneys' fees and expenses, Doc. 69; a motion for final approval of the class action settlement, Doc. 72; supporting briefs, Docs. 70, 71, 73; and declarations by plaintiff's counsel under oath. Docs. 70-1, 70-2, 73-1. A senior project manager at Verita Global, the Settlement Administrator, attests to its compliance with the court-approved Notice Plan, providing the number of claims submitted to date and affirming that no objections or opt-outs were received. Docs. 73-2, 74. The Court again required more information and explanation. Doc. 75. Plaintiff's counsel addressed the Court's questions in a supplemental declaration. Doc. 76.

The Court held a final settlement hearing on January 30, 2025. Minute Entry 01/30/2025. Plaintiff's counsel reviewed the notice process and the way the Settlement

3

Administrator resolved claims, explained his personal knowledge of the expert's work to identify class members, and summarized the reasons the motions should be granted. The defendants were present through counsel. *Id.* They confirmed various details provided by plaintiff's counsel and did not object to either motion.

## II.     Certification of Settlement Classes

When a settlement is reached before Rule 23 certification, a class may be certified solely for the purposes of settlement. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Covarrubias v. Capt. Charlie's Seafood, Inc.*, No. 10-CV-10, 2011 WL 2690531, at *2 (E.D.N.C. July 6, 2011); Fed. R. Civ. P. 23(e). "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up). To qualify for the exception, the plaintiffs "must affirmatively demonstrate their compliance" with Federal Rule of Civil Procedure 23. *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022) (cleaned up). District courts must rigorously assess the proffered evidence, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011), but they have "wide discretion" in evaluating whether the Rule 23 requirements have been met. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010).

Subject to various exclusions, the proposed class for settlement purposes is defined as follows:

> All regular users or subscribers to numbers assigned to wireless carriers which Change Healthcare, on behalf of BCBSNC, called during the Settlement Class Period using an artificial or pre-recorded

4

voice who were not members or subscribers of BCBSNC or that opted
out of receiving calls from Change Healthcare.

Doc. 63-1 at ¶ 1.1.33; Doc. 66 at ¶ 7.

## A. Threshold Requirements

As a threshold matter, Rule 23 requires the proposed class members to be readily identifiable or ascertainable and the proposed class representative to be a member of the proposed class. *See Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021) (recognizing an "implicit threshold requirement" that class members be "readily identifiable"); *Amchem*, 521 U.S. at 625–26 ("A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (cleaned up)); *see also* Fed. R. Civ. P. 23(a). To be readily identifiable, plaintiffs do not need to be able to "identify every class member at the time of certification." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)). Rather, a class need only be defined "in such a way as to ensure that there will be some administratively feasible way for the court to determine whether a particular individual is a member at some point." *Id.* (cleaned up); *see also Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 393 (M.D.N.C. 2015) ("Ascertainability only requires that a court be able to identify the class members in reference to objective criteria." (cleaned up)).

Here, the class members are readily identifiable. The class is defined using objective criteria: whether consumers' phone numbers appeared in the defendants' call records and whether they were not BCBSNC customers or had opted out of receiving

5

phone calls from Change Healthcare. *See* Doc. 63-1 at ¶ 1.1.33; Doc. 66 at ¶ 7. Plaintiff's counsel, an expert, and the Settlement Administrator identified some 900 class members using the defendants' call records and records from wireless carriers.[1] Doc. 74 at ¶¶ 5–6; Doc. 73-1 at ¶ 5; Doc. 76 at ¶¶ 3–6. An additional 662 class members were identified and validated through the claims process. Doc. 76 at ¶¶ 16–17; Doc. 74 at ¶ 14. Any other remaining class members were readily identifiable upon production of records or other evidence linking them to the relevant phone numbers.

Ms. Stark, the representative plaintiff, is a part of the class. Doc. 63-1 at ¶ 1.1.29; Doc. 73-1 at ¶ 10. Like other class members, she received unauthorized calls from Change Healthcare on behalf of BCBSNC. Doc. 48 at ¶¶ 47–48. The threshold requirements are met.

### B. Rule 23(a)

Plaintiffs seeking class certification must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Peters*, 2 F.4th at 241. "These four requirements effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Krakauer*, 925 F.3d at 654 (cleaned up).

---

[1] Based on a review of the defendants' call records, the plaintiff's expert identified some 1,400 phone numbers as wireless numbers belonging to class members. Doc. 76 at ¶ 5. Class counsel subpoenaed phone records from wireless carriers, and the Settlement Administrator cross-referenced the lists, resulting in identifying information for some 900 class members. Doc. 74 at ¶¶ 5–6; Doc. 73-1 at ¶ 5; Doc. 76 at ¶¶ 4–6. Wireless carriers did not have and did not provide identifying information for the remaining phone numbers. Doc. 76 at ¶ 15 n.3.

### 1. Numerosity

Rule 23(a) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "no specified number is needed to maintain a class action, . . . a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (cleaned up).

All parties agree that there are an estimated 3,000 potential settlement class members. Doc. 76 at ¶ 7; Doc. 73-1 at ¶ 4. A little over half of this number have been identified and verified. Doc. 76 at ¶ 17 (noting that "there are 1,573 Settlement Class Members entitled to a pro rata distribution"). Joinder of this many plaintiffs would be impracticable. *See* Fed. R. Civ. P. 23(a)(1). The numerosity requirement is met.

### 2. Commonality

To satisfy the commonality requirement, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, "the plaintiff [must] demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 349–50 (cleaned up). "Even a single common question will do," *id.* at 359 (cleaned up), "but it must be of such a nature that its determination will resolve an issue that is central to the validity of each one of the claims in one stroke." *EQT*, 764 F.3d at 360 (cleaned up); *see also Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 780 (4th Cir. 2023) ("Commonality requires [that] an entire set of claims depend upon a common contention that is capable of class wide resolution." (cleaned up)).

Here, common questions of law and fact exist. They include: (1) whether an artificial or pre-recorded voice was used on calls to class members; (2) whether the calls were made to cellular telephone numbers; and (3) whether BCBSNC is vicariously liable for the calls. Doc. 63 at 14; Doc. 48 at ¶ 52. Every class member alleges the same harm caused by the defendants' unauthorized calls in violation of the TCPA. Doc. 48 at ¶¶ 47–49, 63, 67. The commonality requirement is met.

### 3. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is met where the claims asserted by the named plaintiffs arise from the same course of conduct and are based on the same legal theories as the claims of the unnamed class members." *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 65 (M.D.N.C. 2008) (cleaned up). This requirement "goes to the heart of a representative parties' ability to represent a class," and the named plaintiff's interest in prosecuting its case "must simultaneously tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). But the claims of the class representative and the claims of the class need not "be perfectly identical or perfectly aligned." *Id.* at 467.

Here, the claims of the named plaintiff, Ms. Stark, are typical of the claims of the class members. Her claim, like those of the class members, arises from Change Healthcare's alleged use of artificial or pre-recorded voice messages without the recipient's prior express consent or after the recipient opted out from receiving additional

8

calls. Doc. 48 at ¶ 49; *see Tatum*, 254 F.R.D. at 65. The named plaintiff also advances the interests of the absent class members because she alleges the same injuries and legal harms any class member would raise. The typicality requirement is met.

### 4. Adequacy of Representation

Rule 23(a) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as to assess the "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625, 626 n.20; *see also Wal-Mart*, 564 U.S. at 349 n.5; *Carolina Youth*, 60 F.4th at 780. There are two components to the adequacy requirement: "(1) the interests of the proposed class representatives and class members must coincide; and (2) the plaintiffs' attorneys must be qualified, experienced, and able to conduct the litigation." *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 308 (D. Md. 2022).

First, there does not appear to be a meaningful actual or potential conflict of interest between Ms. Stark and the settlement class members. Ms. Stark is a member of the class she seeks to represent, possesses the same interests as the class, and alleges that she suffered the same injury as the proposed class members as a result of the same TCPA violations. Doc. 48 at ¶¶ 14–23, 32–33, 47–49; Doc. 63-2 at ¶ 9; *see Amchem*, 521 U.S. at 625–26. Ms. Stark is not seeking a service award, Doc. 73-1 at ¶ 19, so she will receive an award through the same process as the other proposed class members.

Second, the legal representatives are adequate. Plaintiff's counsel, Avi Kaufman and Stefan Coleman, have substantial experience and expertise in complex class actions,

9

including the settlement of nationwide TCPA class action cases. *See* Doc. 70-1 at ¶ 25; Doc. 70-2 at ¶¶ 3–4; Doc. 63-2 at pp. 9–13 ¶¶ 22–27, pp. 27–28.

Ms. Stark has served as an adequate lead plaintiff. Plaintiff's counsel is qualified and able to conduct the legal representation. The requirements of Rule 23(a)(4) are met.

## C. Rule 23(b)

A plaintiff pursuing a class action must also establish that the case fits into at least one of the three subsections of Rule 23(b). *Comcast Corp.*, 569 U.S. at 33. The plaintiff here relies on Rule 23(b)(3), Doc. 63 at 15, a "common vehicle" used to "seek damages for widespread wrongful conduct." *Krakauer*, 925 F.3d at 655. Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *accord Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.[2] All issues need not be common. *Krakauer*, 311 F.R.D. at 399.

Here, the circumstances of each class member are sufficiently similar, creating predominating questions of law and fact. All potential settlement class members

---

[2] Courts look to the elements of the cause of action to decide if common questions of law or fact predominate. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Under the relevant section of the TCPA, a plaintiff must show: (1) that the defendant called the plaintiff's cellular telephone; (2) using an artificial or prerecorded voice; (3) without the plaintiff's prior express consent. *See Hossfeld v. Gov't Emps. Ins. Co.*, 88 F. Supp. 3d 504, 509 (D. Md. 2015); 47 U.S.C. § 227(b)(1)(A)(iii).

10

allegedly received a call to their cellular telephone from Change Healthcare on behalf of BCBSNC. Doc. 48 at ¶ 49. Those calls all allegedly used an artificial or pre-recorded voice. *Id.* And the potential settlement class members allegedly did not provide consent for those calls or had opted out of receiving additional calls. *Id.* The evidence about whether these calls were made and, to some extent, whether Change Healthcare knew the cell phone user was no longer a BCBSNC customer or had communicated a lack of consent, can be obtained from the defendants' records, requiring minimal individual determinations.

Some courts have refused to certify TCPA "wrong number" classes because the issue of consent can require an individualized inquiry which predominates over the common questions. *See Davis v. Cap. One, N.A.*, No. 22-CV-903, 2023 WL 6964051, at *15 (E.D. Va. Oct. 20, 2023) (collecting cases). But in the settlement context here, lack of consent is determined by common evidence and methods of proof. Using the defendants' records, it is straightforward to tell whether an individual (1) was or was not a BCBSNC customer or (2) had or had not opted out of receiving calls from the defendants. *See* Doc. 63-1 at ¶ 1.1.33; Doc. 66 at ¶ 7. The plaintiff presents a reasonably reliable method of determining whether the call recipients are in either of those categories. *See* Doc. 76 at ¶¶ 3, 4, 17. For two-thirds of the identified class members, consent was ascertained by the same common evidence and methods, *id.* at ¶¶ 3–6, and for the remainder, there was a simple process easily managed by the Settlement Administrator. *Id.* at ¶¶ 16–17; *see also Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 298 (D. Utah. 2021) (finding that common questions predominate because the element of

11

consent can be established through common evidence); *Lavigne v. First Cmty. Bancshares, Inc.*, No. 15-CV-934, 2018 WL 2694457, at *8 (D.N.M. June 5, 2018) (same); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 301–02 (N.D. Cal. 2017) (finding that the case was distinguishable from *Davis* because the expert provided a reliable method for reverse-lookup of "wrong number" calls). There is no evidence that the proposed class includes non-actionable calls. *See Krakauer*, 311 F.R.D. at 399. In this settlement context, common questions predominate.

Class action adjudication of this matter is also superior to other methods. The lead plaintiff has represented the potential class members fairly and adequately. *See, e.g.*, Doc. 63-2 at ¶¶ 9, 12, 21. She asserts the same harms and interests and has claims typical of the class members. *See* Doc. 48 at ¶¶ 14–23, 32–33, 47–49. Mr. Kaufman and Mr. Coleman are experienced and competent to prosecute complex class actions, including the settlement of a large TCPA class action. *See* Doc. 70-1 at ¶ 25; Doc. 70-2 at ¶¶ 3–4; Doc. 63-2 at pp. 9–13 ¶¶ 22–27, pp. 27–28.

Class certification is also more efficient than individual litigation. The parties estimate that the class includes 3,000 people. Doc. 76 at ¶ 7; Doc. 73-1 at ¶ 4. In total, there are 1,573 settlement class members entitled to *pro rata* distribution. Doc. 76 at ¶ 17. Individual litigation would consume significant time and resources of the Court and the parties, and much of the work would be duplicative.

The requirements for class certification under Rule 23(b) are met. *See* Fed. R. Civ. P. 23(b)(3). For purposes of this settlement, the Court will certify the class as defined in

12

the settlement agreement, Doc. 63-1 at ¶ 1.1.33, certify Ms. Stark as class representative, and appoint Plaintiff's counsel as class counsel.

## III.    Approval of Final Settlement

"It has long been clear that the law favors settlement." *United States v. Manning Coal Corp.*, 977 F.2d 117, 120 (4th Cir. 1992).  This is particularly true in class actions. *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998) (noting the "strong judicial policy in favor of settlements, particularly in the class action context"); *accord Reed v. Big Water Resort, LLC*, No. 14-CV-1583, 2016 WL 7438449, at *5 (D.S.C. May 26, 2016); 4 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 13:44 n.1 (6th ed. 2022) (collecting cases).

A court can only approve a class action settlement "after a hearing" and only if the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Courts in this circuit "bifurcate[] the analysis into consideration of fairness, which focuses on whether the proposed settlement was negotiated at arm's length, and adequacy, which focuses on whether the consideration provided the class members is sufficient." *Beaulieu v. EQ Indus. Servs., Inc.*, No. 06-CV-400, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009) (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991)); *accord Roldan v. Bland Landscaping Co.*, No. 20-CV-276, 2022 WL 17824035, at *2 (W.D.N.C. Dec. 19, 2022).

### A.    Fairness

The fairness analysis aims "to ensure that a settlement is reached as a result of good-faith bargaining at arm's length, without collusion." *Berry v. Schulman*, 807 F.3d

600, 614 (4th Cir. 2015) (cleaned up). Courts apply a four-factor test to determine the fairness of a proposed settlement: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of" law at issue. *In re Jiffy Lube*, 927 F.2d at 158–59; *accord 1988 Tr.*, 28 F.4th at 525.

Here, all four fairness factors support preliminary approval. The plaintiff initiated the litigation over two years ago, and the parties vigorously represented their respective interests, resulting in dispositive motions, significant written fact discovery, expert analysis of the call records, and depositions of the defendants' corporate representatives. Doc. 63-2 at ¶ 5. Through formal discovery and informal exchange of information, plaintiff's counsel gained an understanding of the evidence in this case and could prepare for an informed settlement negotiation. *See id.* at ¶¶ 12, 14–15.

At the time settlement was proposed, the plaintiff's motion for class certification was due on May 24, 2024, with a response by the defendants due on July 2, 2024. Text Order 08/24/2023; Doc. 45 at 3. A jury trial with an expected length of three to five days had been demanded, Doc. 45 at 3, and was scheduled for November 4, 2024. Doc. 61.

The attorneys representing the proposed settlement class have experience in class action litigation. *See* Doc. 63-2 at pp. 9–10 ¶¶ 22–24, pp. 27–28; Doc. 70-1 at ¶¶ 22, 25; Doc. 70-2 at ¶¶ 3–4. Mr. Kaufman's firm has been appointed class counsel in at least 23 other TCPA cases. Doc. 70-1 at ¶ 25. Before this settlement, class counsel had recovered via settlement more than $100 million on behalf of TCPA class members. *Id.* at ¶ 21.

14

Mr. Coleman has participated in at least 15 other TCPA cases and obtained class settlements for as much as $26.91 million. Doc. 70-2 at ¶ 4.

The parties engaged in settlement negotiations at arm's length. Doc. 63-2 at ¶ 29. They negotiated with the assistance of a retired United States Magistrate Judge at an all-day mediation, and negotiations continued with the judge's assistance until the parties reached an agreement. *Id.* at ¶ 14.

The Court finds that the final settlement is fair.

### B. Adequacy and Reasonableness

Courts assess the adequacy of a settlement through the following factors:

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*In re Jiffy Lube*, 927 F.2d at 159; *accord 1988 Tr.*, 28 F.4th at 526. Courts examine "the amount of the settlement" and ensure the amount offered "is commensurate with the scale of the litigation and the plaintiffs' chances of success at trial." *1988 Tr.*, 28 F.4th at 527.

Here, the relevant factors support approval. The amount of the settlement is adequate and reasonable given the relative strength of the plaintiff's case.

The proposed settlement provides a generous recovery for the settlement class. Given the number of validated class members, *pro rata* distribution of the $1.67 million settlement fund, Doc. 63-1 at ¶ 4.1, is over $1,000 before attorneys' fees and expenses. Actual payments are estimated to be just over $600 for each validated class member.

Doc. 73-1 at ¶ 9. These potential payments are greater than the usual statutory damages the TCPA provides per violative call. 47 U.S.C. § 227(b)(3)(B) (assessing $500 per call unless actual monetary loss is greater). The potential payments are more than the relief provided to claimants in other "wrong number" TCPA settlement classes of which the Court is aware. *See, e.g.*, *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1044 (S.D. Cal. 2015) (granting final approval where each claimant would receive $13.75 payment); *James v. JPMorgan Chase Bank, N.A.*, No. 15-CV-2424, 2017 WL 2472499, at *1–2 (M.D. Fla. June 5, 2017) (granting final approval of $3.75 million settlement fund for the 675,000-member class, of which some 24,000 submitted valid claims). And they are greater than recovery provided in other general TCPA class action settlements. *See, e.g.*, *Boger v. Citrix Sys., Inc.*, No. 19-CV-1234, 2023 WL 3763974, at *11 (D. Md. June 1, 2023) (granting final approval for settlement where "the expected settlement payment for each Class Member [was] $44.14, which exceeds the typical value of claims in similar [TCPA] settlements").

The simplicity of the claims process increases the benefit to members of the class. Plaintiff's counsel and an expert were able to identify nearly one-third of the settlement class using data provided by the defendants and wireless carriers. *See* Doc. 76 at ¶¶ 4–6; Doc. 74 at ¶ 5. Under the Settlement Agreement, these class members will receive a payment without even having to file a claim. Doc. 63-1 at ¶ 4.3.1; Doc. 73-1 at ¶ 5. At the final hearing, the parties represented that the claims process for other class members was simple, and claims were verified with defendants' records.

16

The likely duration, complexity, and uncertainty of continued litigation supports the adequacy of the settlement. Absent settlement, the parties would file dueling briefs on class certification and summary judgment motions. *See* Doc. 63-2 at ¶¶ 31–32. Expert discovery would be necessary and expensive. Continued litigation will be costly to both parties if a settlement is not approved.

The parties recognize the time and expense of continued proceedings to resolve the narrowed claims against the defendants through trial and possible appeals. *Id.* As Ms. Stark and her counsel acknowledge, there are several risks associated with "wrong number" TCPA cases. *See* Doc. 73 at 3, 17–19. Given the uncertain outcome of such litigation, plaintiff's counsel believes the settlement agreement is in the best interests of the plaintiff and the settlement class. Doc. 63-2 at ¶¶ 15, 32.

The motion for preliminary approval of class action settlement was unopposed, Doc. 62, as was the motion for final approval. Doc. 72. As discussed *infra*, class members have had sufficient notice of the settlement, and many have viewed the settlement website or called the Settlement Administrator's toll-free helpline; the website has had 756,689 visits, Doc. 74 at ¶ 11, and the helpline has received 44 calls. *Id.* at ¶ 13. As of January 8, 2025, there were 394,600 claim submissions, of which the Settlement Administrator identified 662 as valid claims. *Id.* at ¶ 14; *see also* Doc. 76 at ¶¶ 16, 19. There were no objections or opt-outs to the settlement. Doc. 74 at ¶¶ 15–16. This is a further indication that the settlement is reasonable.

The Court finds that the final settlement is fair, adequate, and reasonable.

17

## IV. Sufficiency of Notice

"In the context of a class action, the due process requirements of the Fifth Amendment require reasonable notice combined with an opportunity to be heard and withdraw from the class." *Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 472 (W.D. Va. 2011) (cleaned up). For classes certified under Rule 23(b)(3), class members must receive the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

The court-approved notice process was reasonable and provided class members with the best notice practicable under the circumstances. Plaintiff's counsel and the Settlement Administrator took reasonable efforts to identify as many class members as possible. As discussed *supra*, some 900 class members were identified by the plaintiff's expert and the Settlement Administrator, using defendants' call records and records from wireless carriers. Doc. 76 at ¶¶ 3–6; Doc. 74 at ¶ 5. The Settlement Administrator processed the names and addresses through the National Change of Address Database and updated 41 of the addresses. Doc. 74 at ¶ 5. The Settlement Administrator successfully sent postcard notice by mail to those class members who were identified. *Id.* at ¶ 6. The postcard notice provided information about the settlement and the class members' rights, and it informed the recipients that they would automatically receive payment unless they objected or opted out of the settlement. Doc. 73-2 at pp. 13–14.

To reach as many class members without known addresses or identifying information as possible, the Settlement Administrator published digital advertisements on

18

various websites and mobile apps, including Facebook, directing those who believed they may be a member of the settlement class to visit the settlement website. Doc. 74 at pp. 3–4 ¶¶ 8, 10, pp. 17–25. The digital advertisements garnered nearly 8,000,000 digital impressions. *Id.* at ¶ 8. The settlement website provided information about the settlement, answers to frequently asked questions, and copies of the Notice, Claim Form, and other case-related documents. *Id.* at ¶ 10. Visitors to the website could also submit claims online. *Id.* The Settlement Administrator maintained a toll-free telephone number for potential class members to receive information about the settlement, and it had received 44 calls as of January 8, 2025. *Id.* at ¶¶ 12–13. The Settlement Administrator testifies that through both postcard and digital notice, notice of the settlement has reached 72.5% of likely class members. *Id.* at ¶ 9.

One fact showing that the notice was widely disseminated is the number of claims that were submitted: 394,600. *Id.* at ¶ 14. It is obvious that many thousands of these claims were fraudulent, which is a concern,[3] but the large number of claims does demonstrate that the notice process was effective.

The Settlement Administrator made substantial efforts to inform class members of how to opt out or object and of the date and time of the final settlement hearing. *See id.* at ¶¶ 5–14. Engagement with the digital advertisements, website, and telephone hotline and the number of valid claims filed from previously unidentified class members show

---

[3] Under the settlement agreement, the Settlement Administrator decided whether claims were valid by checking phone numbers provided by claimants against Change Healthcare's call records. Doc. 76 at ¶ 17. At the final settlement fairness hearing, the defendants confirmed that they cooperated in this verification process.

19

that notice was widely received. *Id.* at ¶¶ 8, 11, 13–14. The notice was reasonable under the circumstances and satisfies the requirements of due process.

## V. Class Action Fairness Act

Under 28 U.S.C. § 1715(b), within 10 days of a proposed settlement of a class action being filed in court, each defendant must serve upon appropriate state and federal officials notice of the proposed settlement. The Settlement Administrator assumed this duty and has filed notice of compliance with the statutory requirements. *See* Doc. 74 at pp. 2–3 ¶¶ 2–3, pp. 7–11. The Settlement Administrator has not received any responses to those notices. *Id.* at ¶ 4.

## VI. Attorneys' Fees and Expenses

In a class action, "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). When an attorney recovers a common fund for the benefit of a class, counsel "is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Courts calculate attorneys' fees in class actions using either the "lodestar" method or the "percentage of fund" method. *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 758 (S.D. W. Va. 2009). In a common fund case, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). The Fourth Circuit does not require the use of the percentage of fund method, but district courts in this circuit overwhelmingly apply it. *See Phillips v. Triad Guar. Inc.*,

No. 09-CV-71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016); *see also Jones*, 601 F.

Supp. 2d at 758–59 (collecting cases).

To determine the reasonableness of the fee award, courts assess the factors

identified in *Barber v. Kimbrell's, Inc.* or a variant of those factors. *See* 577 F.2d 216,

226 n.28 (4th Cir. 1978); *Phillips*, 2016 WL 2636289, at *3–4. The *Barber* factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the
> questions raised; (3) the skill required to properly perform the legal
> services rendered; (4) the attorney's opportunity costs in pressing the
> instant litigation; (5) the customary fee for like work; (6) the
> attorney's expectations at the outset of the litigation; (7) the time
> limitations imposed by the client or circumstances; (8) the amount in
> controversy and the results obtained; (9) the experience, reputation
> and ability of the attorney; (10) the undesirability of the case within
> the legal community in which the suit arose; (11) the nature and length
> of the professional relationship between attorney and client; and (12)
> attorneys' fees awards in similar cases.

577 F.2d at 226 n.28 (adopting factors from *Johnson v. Ga. Highway Express, Inc.*, 488

F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*,

489 U.S. 87, 92–93 (1989)). Courts do not need to apply these factors in "a formulaic

way" because each case is different. *Feinberg v. T. Rowe Price Grp.*, 610 F. Supp. 3d

758, 771 (D. Md. 2022) (cleaned up) (quoting *Singleton v. Domino's Pizza, LLC*, 976 F.

Supp. 2d 665, 682 (D. Md. 2013)).

## A. Application of Barber Factors

When district courts determine a reasonable fee percentage, the Fourth Circuit has

"noted that the most critical factor . . . is the degree of success obtained." *In re Abrams &*

*Abrams, P.A.*, 605 F.3d 238, 247 (4th Cir. 2010) (cleaned up). Here, class counsel

obtained a good result for the class. The estimated award to each claimant of over $600,

21

Doc. 73-1 at ¶ 9, is far greater than the awards in similar TCPA settlements. *See, e.g.*, *Hashw v. Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 944–45 (D. Minn. 2016) (stating that an award of about $33 per claimant "compares favorably with settlements in other TCPA class actions" and collecting cases); *Vu v. I Care Credit, LLC*, No. 17-CV-4609, 2022 WL 22871480, at *10 (C.D. Cal. Nov. 4, 2022) (noting that an award of $18.57 per claimant "is within the range of other class action settlements under the TCPA that courts have approved" and collecting cases); *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (approving class settlement providing about $34 per claimant).

The judgment is in the form of cash, which is more valuable than other forms of recovery, such as coupons. The recovery for each class member is substantial, and the class members appear satisfied with the settlement as there have been no objections or opt-outs as of January 8, 2025. Doc. 74 at ¶¶ 15–16.

The attorneys representing the proposed settlement class bring significant skills, expertise, and experience to this class action settlement. *See* Doc. 63-2 at pp. 9–10 ¶¶ 22–24, pp. 27–28; Doc. 70-1 at ¶¶ 22, 25; Doc. 70-2 at ¶¶ 3–4. Mr. Kaufman has been appointed class counsel in at least 23 other TCPA cases. Doc. 70-1 at ¶ 25. Class counsel has recovered, not including this proposed settlement, more than $100 million through TCPA class action settlements for the benefit of consumers. *Id.* at ¶ 21. Mr. Coleman also brings significant experience in TCPA class actions, having participated in at least 15 and obtaining class settlements for as much as $26.91 million. Doc. 70-2 at ¶ 4.

22

At the time of the fee application, class counsel had spent over 350 hours to litigate and resolve this case. Doc. 70-1 at ¶ 30; *see also* Doc. 70-1 at ¶¶ 34–40 (Kaufman's time); Doc. 70-2 at ¶¶ 9–15 (Coleman's time).[4] This time included investigating the claim, filing complaints, litigating motions, analyzing discovery, preparing for depositions, consulting with experts, and engaging in settlement negotiations and mediation to reach a settlement agreement. Doc. 70-1 at ¶¶ 34–40; Doc. 70-2 at ¶¶ 9–15. The time class counsel spent on this case prevented them from working on other matters, Doc. 70-1 at ¶ 27, and supports a substantial fee. And class counsel took this case on a contingent basis, with a substantial risk of loss. *Id.* at ¶ 43.

Approved percentage fees typically range between 25% and 33%, absent unusual circumstances. *Jones*, 601 F. Supp. 2d at 763; *see also Ciarciello v. Bioventus Inc.*, No. 23-CV-32, --- F. Supp. 3d ---, 2024 WL 5155539, at *12 (M.D.N.C. Dec. 18, 2024) (approving attorneys' fees of 33% and collecting cases); *Binotti v. Duke Univ.*, No. 20-CV-470, 2021 WL 5366877, at *3 (M.D.N.C. Aug. 30, 2021) (stating that counsel's request for 25% of the fund "is appropriate given the relatively early stage at which

---

[4] Mr. Kaufman and Mr. Coleman both appeared by special appearance, Docs. 5, 21, so they were required to associate with a member of the bar of the Middle District of North Carolina. LR 83.1(d)(1). Attorney Ryan Duffy of Charlotte, North Carolina, who is admitted to practice in the Middle District, has appeared on behalf of the plaintiff as local co-counsel. *See* Docs. 5, 21. As local co-counsel, Mr. Duffy has an affirmative obligation to spend time on this case. *See* LR 83.1(d)(2). Mr. Duffy has not filed an affidavit reflecting that he spent any time on the matter, and other circumstances suggest that Mr. Duffy played a minimal role in prosecuting this case. *See* Doc. 78. The Court appreciates efforts to reduce duplication of work, but local co-counsel plays an important role in this district. *See generally Duke Univ. v. Universal Prods. Inc.*, No. 13-CV-701, 2014 WL 3670019, at *3 (M.D.N.C. July 24, 2014). Failure to play that role can result in real problems for the Court, for litigants, and for attorneys. *See* Memorandum Opinion and Order, *In re: John David Matheny, II, Att'y*, No. 22-MC-31, Doc. 9 (M.D.N.C. Mar. 24, 2023) (ordering sanctions for local co-counsel).

23

settlement occurred").  Courts in this circuit have approved attorneys' fees within this range for TCPA class action settlements.  *See, e.g.*, *Boger*, 2023 WL 3763974, at *12–14 (granting attorneys' fees of one-third of the settlement fund in TCPA class action settlement); *Kensington Physical Therapy, Inc. v. Jackson Therapy Partners, LLC*, No. 11-CV-2467, Doc. 105-1 at ¶ 5, Doc. 110 at ¶ 13 (D. Md. Oct. 21, 2014, and Feb. 12, 2015) (same).

As discussed *supra*, many of the factors weigh in favor of awarding attorneys' fees on the higher end of that range.  But a few factors support awarding a fee slightly lower than 33%.  The settlement took place before briefing on class certification was required, depositions of experts were not needed, and summary judgment was well in the future.  This relatively early settlement supports a slightly lower percentage fee than when a case settles later and more time has been spent.  *See Binotti*, 2021 WL 5366877, at *3; *see also Brent v. Advanced Med. Mgmt., LLC*, No. 23-CV-3254, 2024 WL 5118528, at *8 (D. Md. Dec. 16, 2024) (noting that earlier settlement demonstrates lower risk of nonpayment).

In addition, counsel took a fairly casual approach to the motions for preliminary and final approval, leaving out key information the Court needed to meet its obligations.  *See* Text Order 06/24/2024; Doc. 75.[5]  This required the Court to spend substantial time and energy to search the record for necessary information and then to require supplemental submissions.  *See* Text Order 06/24/2024; Doc. 75.  It also appears that

---

[5] The Court has a fiduciary obligation to the class members, *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019) (collecting sources), a fact class counsel did not appear to fully appreciate.  Over-reliance on class counsel's conclusory representations is an inappropriate way to meet this responsibility.  *See 1988 Tr.*, 28 F.4th at 520–21.

counsel has not involved local co-counsel as required by Local Rule 83.1(d). *See* Docs. 70, 70-1, 70-2 (showing no time spent by local co-counsel). Ultimately though, counsel did obtain a very good result for the class, and counsel was able to provide the information the Court needed. Under the *Barber* factors, the Court finds that a percentage fee of 30% of the $1,670,000 common fund, or $501,000, is appropriate.

Class counsel asks for one-third of the common fund in attorneys' fees, or $556,666.67, to pay all attorneys and law firms involved on behalf of the named plaintiff and the class. Doc. 70 at 9–10. While this percentage fee has been approved in a number of cases, each case has different facts, different procedural postures, and different results; no case is exactly like another. The Court has considered this request, but in light of the deficiencies noted and the early settlement, the Court finds a 30% fee to be more appropriate.

### B. Lodestar Cross-Check

Courts that apply the percentage of funds method can also conduct a lodestar cross-check to evaluate the reasonableness of an attorneys' fee award. *Phillips*, 2016 WL 2636289, at *7. To calculate a lodestar figure, courts multiply a reasonable hourly rate by the hours reasonably expended. *Grissom v. Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). "The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar." *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 467 (D. Md. 2014). When courts use the lodestar cross-check, they "need[] not apply the exhaustive scrutiny typically mandated" and can "accept the hours

25

estimates provided by Lead Counsel." *In re Mills Corp.*, 265 F.R.D. 246, 264 (E.D. Va. 2009) (cleaned up).

Class counsel spent a total of 352 hours to litigate and resolve this case. Doc. 70-1 at ¶ 43. The reported hours constitute a reasonable basis for a cross-check. *See In re Mills Corp.*, 265 F.R.D. at 264.

To decide a reasonable billing rate, courts look to the prevailing market rates, including the attorneys' actual billing rate and "fees paid to attorneys of comparable skill in similar circumstances." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). Courts often recognize national market rates when deciding reasonable billing rates for complex class action litigation. *See Phillips*, 2016 WL 2636289, at *7 (citing *In re MicroStrategy, Inc.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001)) (describing the market for attorneys in PSLRA class actions as "nationwide"); *Feinberg*, 610 F. Supp. 3d at 772–73 (same for ERISA).

Here, class counsel provides undisputed evidence of an hourly rate of $800 per hour for Mr. Kaufman and $730 per hour for Ms. Kaufman and Mr. Coleman. Doc. 70-1 at ¶¶ 31–32. Mr. Duffy apparently spent no time on the case. The rates provided by counsel are the same as those they have used in other TCPA cases, *see id.* at ¶ 31 (listing cases with similar fees), and these fees are similar to rates recently applied in TCPA class action litigation in this circuit. *See Krakauer v. Dish Network, L.L.C.*, No. 14-CV-333, 2018 WL 6305785, at *5 (M.D.N.C. Dec. 3, 2018) (finding rates of $325 to $760 per hour for attorneys reasonable); *Kensington Physical Therapy*, No. 11-CV-2467, Doc. 108 at 30 (D. Md. Feb. 4, 2015) (finding rate of $700 per hour for partners was reasonable).

26

The contingent nature of the case also supports a higher hourly rate than might apply in ordinary complex litigation in this district.

Using the hourly rates submitted by counsel, the lodestar value here is $268,370, Doc. 70-1 at ¶ 32 (counsel's computation confirmed by the Court). A 30% fee is $501,000, representing a lodestar of 1.87.[6] This adequately compensates counsel for the risks they assumed in taking on this case. A lodestar cross-check confirms that the requested attorneys' fees are reasonable.

## C. Firm Expenses

Rule 23(h) allows courts approving class action settlements to award nontaxable costs authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). Courts in the Fourth Circuit will allow reasonable, litigation-related expenses in addition to the fee award. *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014); *Binotti*, 2021 WL 5366877, at *5.

Class counsel requests an award of $21,407.62 in litigation expenses. Doc. 71 at 1.[7] These expenses are comprised of $455 for filing fees, $7,386.30 for expert fees,

---

[6] In *Abramson v. Safe Sts. USA LLC*, class counsel, the same counsel here, used a more conservative hourly rate of $550 for their lodestar calculation. No. 19-CV-394, Doc. 114-1 at ¶ 22, Doc. 117 at ¶ 8 (E.D.N.C. Dec. 29, 2021, and Jan. 12, 2022); *see* Doc. 70-1 at ¶ 32, n.3. Even if counsel used that lower rate in this case, the lodestar multiplier would be 2.59, Doc. 70-1 at ¶ 32, n.3 (counsel's computation confirmed by the Court and adjusted to a 30% fee award), which is reasonable, particularly given the risks associated with this case and the degree of success obtained.

[7] Counsel originally requested $21,637.62, Doc. 70 at 4, but this calculation was based on an estimate of the bill for subpoena compliance from AT&T. Doc. 70-1 at ¶ 41 n.4. After submitting the motion for attorneys' fees and expenses, counsel filed notice informing the Court that the bill from AT&T was $230 less than expected. Doc. 71 at 1.

27

$1,407.80 for mediation costs, $661.20 for service of process, $9,415 for payments associated with third party wireless carrier document productions, $866 for deposition costs, and $1,216.32 for travel expenses. Doc. 70-1 at ¶ 41; Doc. 71 at 1.

Lead counsel testifies that this list of expenses is accurate based on information that counsel maintained as expenses were incurred, Doc. 70-1 at ¶ 42, and that these expenses were necessary for this litigation. *Id.* at ¶ 41. Most of the fees are in line with expenses the Court has seen in other complex litigation. The fees to the wireless carriers were necessary to identify class members. *See* Doc. 76 at ¶ 6. The Court approves an award of $21,407.62 to cover these litigation-related expenses. The requested amount is fair and reasonable.

## VII. Settlement Administration Fees

The Settlement Administrator estimates its total cost of administration to be $107,463.74. Doc. 74 at ¶ 17. This sum includes costs to date and an estimate of the costs remaining. *Id.* While this fee is larger than what was originally projected, the increased cost is reasonable given the substantial number of claims filed, most of which were invalid. *See id.* at ¶ 14. After negotiations with class counsel, the Settlement Administrator gave a substantial discount on processing and validation charges. *See* Doc. 76 at ¶ 19. The Court appreciates the Settlement Administrator's resolution of these unexpectedly high expenses.

## VIII. Distribution to Cy Pres Recipient

After paying attorneys' fees and expenses and the settlement administration costs, settlement funds will be distributed via *pro rata* payments to class members who

28

submitted valid and timely claims. Doc. 63-1 at ¶ 4.3.3. The settlement is non-reversionary, *id.* at ¶ 1.1.36, so residual funds will not be returned to the defendant. There may or may not be residual funds.

"Most class actions result in some unclaimed funds," *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990), and *cy pres* has often been used as a remedy when class actions are settled. *Krakauer v. Dish Network, LLC*, No. 14-CV-333, 2020 WL 6292991, at *3 (M.D.N.C. Oct. 27, 2020). Such distribution to a charity or non-profit should address the objectives of the underlying statutes, target the plaintiff class, and provide reasonable certainty that class members will benefit. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011); *Six (6) Mexican Workers*, 904 F.2d at 1307; *Krakauer*, 2020 WL 6292991, at *3; *see also Frank v. Gaos*, 586 U.S. 485, 490–91 (2019) ("In the class action context, *cy pres* refers to the practice of distributing settlement funds . . . to nonprofit organizations whose work is determined to indirectly benefit class members."); *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013) ("Money not claimed by class members should be used for the class's benefit to the extent that is feasible.").

The parties initially agreed that any residual funds will be paid as a *cy pres* distribution to the National Legal Aid and Defender Association subject to approval by the Court. Doc. 63-1 at ¶¶ 1.1.9, 7.7. But at the final approval hearing, the parties requested that the question of an appropriate *cy pres* recipient be deferred because of a current lack of evidence that this is an appropriate *cy pres* recipient and because there

29

may not be any funds for *cy pres* distribution. The Court will hold this matter open, pending a final report from the Settlement Administrator.

## IX. Conclusion

Final certification of the class and approval of the class action settlement is appropriate. The requirements of Rule 23 are met, and settlement is in the best interests of the class members. The Court grants fair and reasonable attorneys' fees of 30% of the settlement fund. The request for expenses by the attorneys and Settlement Administrator is also reasonable. Final judgment is entered concurrently.

For these reasons and based on the record before the Court, it is **ORDERED and ADJUDGED** that:

1. The plaintiff's motion for final approval of class action settlement, Doc. 72, is **GRANTED**.

2. For purposes of this settlement, the Court finally certifies the class as defined in the Settlement Agreement, Doc. 63-1 at ¶ 1.1.33, certifies Ms. Stark as class representative, and confirms the appointment of Plaintiff's counsel as class counsel.

3. The plaintiff's motion for attorneys' fees and expenses, Doc. 69, is **GRANTED** as follows:

   a. Class counsel is awarded attorneys' fees of 30% of the settlement fund, $501,000.

   b. Class counsel **SHALL** be reimbursed $21,407.62 for expenses.

c. All payments of attorneys' fees and reimbursement of expenses to class counsel in this action **SHALL** be made from the settlement fund, and the Released Parties shall have no liability or responsibility for the payment of class counsel's attorneys' fees or expenses.

d. Payment of up to $107,463.74 to the Settlement Administrator is authorized as fair and reasonable compensation for its work. Should its final fee exceed that amount for unexpected reasons, class counsel may file a supplemental motion.

4. The Settlement Administrator **SHALL** make all required payments from the settlement fund in accordance with the amounts and the times set forth in the settlement agreement, including all payments to Identifiable Settlement Class Members whose summary notices were not returned and who did not opt out of the settlement and to any other class member who submitted an approved claim, as approved herein; for the attorneys' fees and costs, approved herein; and for all settlement administration costs.

5. All funds held by the Settlement Administrator **SHALL** be deemed and considered to be *in custodia legis* of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds are distributed pursuant to the settlement or further order of the Court.

6. No later than November 17, 2025, the Settlement Administrator **SHALL** file a final status report setting forth a summary of all payments to class

31

members, a list of all other disbursements, the status of distributions, and any work necessary to conclude its duties.

7. The parties **SHALL** thereafter meet and confer about an appropriate *cy pres* recipient, if there are undistributed funds, and no later than December 17, 2025, **SHALL** file a motion directed to that issue or a notice that there are no undistributed funds. The Court further retains jurisdiction to approve a *cy pres* recipient or recipients.

8. This Order applies to all claims or causes of action settled under the settlement agreement and binds all settlement class members, including those who did not properly request exclusion under the Preliminary Approval Order. This order does not bind persons or entities who submitted timely and valid requests for exclusion.

9. The plaintiff and all settlement class members who did not properly request exclusion are deemed to have completely released and forever discharged the Released Parties for the Released Claims. The full terms of the release described in this paragraph are set forth in the settlement agreement and are specifically incorporated herein by this reference.

10. No person or entity shall have any claim against the defendants, defense counsel, the Released Parties, the plaintiff, the settlement class members, class counsel, or the Settlement Administrator based on distributions and payments made in accordance with the settlement agreement.

11. The Court hereby enters **FINAL JUDGMENT**, and all claims are **DISMISSED** with prejudice. Without affecting the finality of the judgment entered, the Court reserves jurisdiction over the implementation of the settlement, including enforcement and administration of the settlement agreement and decisions about any *cy pres* recipient.

12. The parties shall bear their own costs except as provided by the settlement agreement and as ordered herein.

This the 18th day of February, 2025.

_____
UNITED STATES DISTRICT JUDGE